## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS

_____
　　　　　　　　　　　　　　　　 )
PATRICIA Y. DAWSON,　　　　　　 )
　　　　　　　　　　　　　　　　 )
　　　　　 Plaintiff,　　　　　　 )　　　 No. 4:14-cv-00583-SWW
　　　　　　　　　　　　　　　　 )
　　 v.　　　　　　　　　　　　　 )
　　　　　　　　　　　　　　　　 )
H & H ELECTRIC, INC.,　　　　　　 )
　　　　　　　　　　　　　　　　 )
　　　　　 Defendant.　　　　　　 )
_____ )

## PLAINTIFF'S BRIEF IN SUPPORT OF RESPONSE IN OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Ria Tabacco Mar*
Leslie Cooper
American Civil Liberties Union
 Foundation
125 Broad Street
New York, New York 10004
Telephone: (212) 549-2627
E-mail: rmar@aclu.org
　　　　 lcooper@aclu.org
* admitted pro hac vice

John Burnett (Arkansas Bar No. 77021)
Lavey and Burnett
904 West 2nd Street
Little Rock, Arkansas 72201
Telephone: (501) 376-2269
E-mail: jburnett@laveyandburnett.com
On behalf of the Arkansas Civil Liberties Union
　　　　 Foundation, Inc.

Attorneys for Plaintiff

Dated:  June 19, 2015　　　　　　　 ORAL HEARING REQUESTED

## **INTRODUCTION**

After four years as an electrical apprentice, Plaintiff Patricia Y. Dawson was well-regarded by her boss, H & H Electric, Inc. Vice President Marcus Holloway, and proud to be one of his "best people."  That is why she was shocked when his reaction to the news that she is transgender was that he might have to fire her.  When Plaintiff told him that she is transgender and had changed her name to Patricia, he said "I'd hate to lose you" and that he needed the weekend to think about what to do.  Holloway didn't fire her at that time; instead, he repeatedly instructed her to "keep quiet" about her gender transition.  He refused to allow her to use her legal name, Patricia; to dress in women's clothing; or to use the women's restroom.  Ultimately, Plaintiff's gender transition became apparent, leading to her termination.  Ten days after Plaintiff wore a blouse and makeup to work, Holloway fired her, saying, "I'm sorry, Steve.  You do excellent work, but you are too much of a distraction.  I'm going to have to let you go."

There is ample evidence in the record from which a reasonable factfinder could conclude that Holloway's decision to fire Plaintiff was "because of sex."  Plaintiff was fired shortly after wearing feminine clothes and makeup contrary to the instructions of her boss to "keep quiet" about her gender transition.  Defendant's human resources manager testified that the only thing she knew about Plaintiff's termination was "that she had dressed in a blouse and jewelry when she shouldn't have" and that she "thought that the way she had dressed was – could be the cause of her termination."  And Defendant's President and owner, when he learned that Plaintiff had been fired, responded by saying that she "shouldn't be wearing earrings on the plant floor and she shouldn't have been wearing a dress on the plant floor."

Defendant's proffered justification for its decision to fire Plaintiff – that she supposedly threatened to sue Defendant's client, Remington – appears to have been concocted after the fact

1

to cover up Defendant's blatant sex discrimination.  Defendant's human resources manager testified that she initially believed that Plaintiff's employment was terminated because she wore women's clothing and jewelry, but that after speaking with Defendant's attorneys her understanding of why Plaintiff was fired changed.  Additionally, Defendant's story is flatly contradicted by the testimony of two Remington personnel who, Defendant claims, were involved in a meeting the day that Plaintiff was fired.  Both third-party witnesses deny that the pivotal meeting described in detail by Holloway even happened.  Given the significant evidence that Defendant's decision to fire Plaintiff was because of sex and that Defendant's proffered justification is false, and that all reasonable inferences must be drawn in Plaintiff's favor, Defendant's motion for summary judgment should be denied.

## STATEMENT OF FACTS

Plaintiff is a journeyman electrician licensed by the State of Arkansas.  Ex. A (Dawson Decl.) ¶ 2; Ex. B (Dawson Tr.) 9:11-10:3.  She was hired as an electrical apprentice with Defendant, an electrical contracting company, in 2008.  Ex. A (Dawson Decl.) ¶ 3; Ex. C (Holloway Tr.) 7:23-24, 8:29-20, 9:1-2.  Plaintiff was well-qualified for this position.  She holds an associate's degree in electronics from Southern Technical College and had more than ten years of experience as an industrial electrician.  Ex. A (Dawson Decl.) ¶ 3; Ex. B (Dawson Tr.) 8:25-9:22.  During her employment with Defendant, Plaintiff received regular wage increases based on her job performance.  Ex. A (Dawson Decl.) ¶ 4; Ex. C (Holloway Tr.) 11:7-16:17.

At the time Plaintiff was hired by Defendant, she was using her birth name, Steven, and presenting as male.  Ex. A (Dawson Decl.) ¶ 5; Ex. C (Holloway Tr.) 23:9-18.  Plaintiff's assigned sex at birth was male, but over time she came to understand that the gender designation assigned to her at birth does not conform to her gender identity and was diagnosed with Gender

Dysphoria. Ex. A (Dawson Decl.) ¶ 6; Ex. B (Dawson Tr.) 17:7-18:10. Gender Dysphoria, previously known as Gender Identity Disorder, is the medical diagnosis given to individuals whose gender identity – their innate sense of being male or female – differs from the sex they were assigned at birth and who experience distress as a result. Ex. A (Dawson Decl.) ¶ 7. As part of her treatment for Gender Dysphoria, Plaintiff began the process of transitioning from male to female. *Id.* ¶ 8; Ex. B (Dawson Tr.) 17:7-19:11.

On Friday, June 22, 2012, Plaintiff approached Marcus Holloway, her boss and Defendant's Vice President, and told him that she needed to have a discussion with him. Ex. A (Dawson Decl.) ¶ 11; Pl. 56.1 ¶ 11. Plaintiff asked Holloway if he had heard of the term transgender and said that it would be a good term to describe her. Ex. A (Dawson Decl.) ¶ 11; Pl. 56.1 ¶ 11. Plaintiff then showed Holloway her new driver's license, which bore the name Patricia Yvette Dawson and the gender marker "F" for female. Ex. A (Dawson Decl.) ¶ 11; Pl. 56.1 ¶ 11. Holloway appeared surprised and responded, "You're one of the best people I have. I'd hate to lose you." Ex. A (Dawson Decl.) ¶ 11; Pl. 56.1 ¶ 11. He also told Plaintiff that she should "keep things quiet" and not tell anyone at work about her gender transition, and that he needed the weekend to think about what to do. Ex. A (Dawson Decl.) ¶ 11; Pl. 56.1 ¶ 11.

The following Monday, Holloway instructed Plaintiff to complete a new set of employment forms in her legal name but to continue to "keep everything quiet" and not discuss her transition with anyone at work. Ex. A (Dawson Decl.) ¶ 12; Ex. B (Dawson Tr.) 121:18-122:6. He also denied her requests to wear women's clothing and makeup and to use the women's restroom at work. Ex. A (Dawson Decl.) ¶ 12; Ex. B (Dawson Tr.) 157:20-158:13. At that time, Plaintiff was assigned to a job site at Remington Arms Co. in Lonoke, Arkansas. Ex. A (Dawson Decl.) ¶ 12; Def. 56.1 ¶ 4.

In July 2012, Plaintiff learned from two of her co-workers that the rumor mill on the Remington job site was churning with the news that her name had changed to Patricia and that she is transgender. Ex. A (Dawson Decl.) ¶ 13; Ex. B (Dawson Tr.) 111:22-115:8. Plaintiff informed Holloway that she was not the source of the information and asked if she could use legal name at work given that others already knew about it. Ex. A (Dawson Decl.) ¶ 13; Ex. B (Dawson Tr.) 115:9-116:22. Holloway refused and told her, "We are guests here [at Remington]. Let's not rock the boat." Ex. A (Dawson Decl.) ¶ 13; Ex. B (Dawson Tr.) 115:9-116:22.

Later that summer, Remington employee Joe Carmichael approached Plaintiff and told her he knew that the name on her driver's license is not what everyone calls her and asked how she would like to be addressed. Ex. A (Dawson Decl.) ¶ 14; Ex. B (Dawson Tr.) 125:12-126:17. Plaintiff responded that she would like to be called Patricia, Trisha, or Trish. Ex. A (Dawson Decl.) ¶ 14; Ex. B (Dawson Tr.) 125:12-126:17. Plaintiff informed Holloway about her conversation with Carmichael, and Holloway again told her not to discuss her gender transition with people at work; he said that they were guests at Remington and not to rock the boat. Ex. A (Dawson Decl.) ¶ 14; Ex. B (Dawson Tr.) 126:18-127:4.

Plaintiff asked Holloway for permission to use her legal name at work at least four times, and each time Holloway denied her requests. Ex. A (Dawson Decl.) ¶ 15; Ex. B (Dawson Tr.) 116:18-22. Remington required contractor employees to complete safety training and to sign daily log books to access the Remington plant and to document the number of hours worked. Ex. A (Dawson Decl.) ¶ 16; Def. 56.1 ¶¶ 6, 13. Plaintiff mentioned the safety records to Holloway and asked if she could use her name on Remington's safety paperwork and log books, but Holloway said no. Ex. A (Dawson Decl.) ¶ 16.; Ex. B (Dawson Tr.) 138:10-20.

During her first week at Remington, one day Plaintiff arrived at the plant wearing hoop earrings that she had forgotten to remove. Ex. A (Dawson Decl.) ¶ 18; Pl. 56.1 ¶ 7. Holloway told her that hoop earrings were not allowed under Remington's safety protocol, and Plaintiff agreed to remove them. Ex. A (Dawson Decl.) ¶ 18; Pl. 56.1 ¶ 7. After that conversation, Plaintiff wore only stud earrings, which were allowed under Remington's safety protocol. Ex. A (Dawson Decl.) ¶ 18; Pl. 56.1 ¶ 7. Later that summer, Plaintiff saw a woman at the Remington plant wearing large, dangly earrings and asked her why she was allowed to wear large earrings when Remington's safety protocol allowed stud earrings only. Ex. A (Dawson Decl.) ¶ 19; Ex. B (Dawson Tr.) 153:19-25. The woman responded that she had worked at Remington for ten or fifteen years and did as she "damn well please." Ex. A (Dawson Decl.) ¶ 19; Ex. B (Dawson Tr.) 153:23-154:3.

Beginning the week of September 7, 2012, Plaintiff began to wear feminine attire and makeup to work. Ex. A (Dawson Decl.) ¶ 20. Ex. B (Dawson Tr.) 179:6-180:22. She also wore a bra despite Holloway's objection. Ex. A (Dawson Decl.) ¶ 20; Ex. B (Dawson Tr.) 186:17-187:16. One day when Plaintiff wore a blouse to work, she learned from one of her co-workers that several workers had commented negatively on it and one had said "that's not right" for Plaintiff to wear a blouse. Ex. A (Dawson Decl.) ¶ 20; Ex. B (Dawson Tr.) 181:6-21.

Holloway was not on the job site the day that Plaintiff first wore a blouse and makeup, but he later approached Plaintiff and told her that it was noticed and reported to him that she wore a blouse. Ex. A (Dawson Decl.) ¶ 21; Pl. 56.1 ¶ 9. He asked Plaintiff, "Are you trying to drive me into early retirement?" Ex. A (Dawson Decl.) ¶ 21; Pl. 56.1 ¶ 9. Holloway said he could not go twenty minutes without someone coming up to him and talking to him about Plaintiff. Ex. A (Dawson Decl.) ¶ 21; Pl. 56.1 ¶ 9. During that conversation, he also asked her

about wearing a blouse to work, and Plaintiff responded that she did wear a blouse.  Ex. A (Dawson Decl.) ¶ 21; Pl. 56.1 ¶ 9.  Holloway then asked if it was low cut, and Plaintiff responded that it was a little low cut, but it was not inappropriate.  Ex. A (Dawson Decl.) ¶ 21; Pl. 56.1 ¶ 9.  Holloway believed Plaintiff that the blouse was not overly low cut.  Pl. 56.1 ¶ 9. During the same conversation, Holloway asked Plaintiff, "What do you want out of this?"  Ex. A (Dawson Decl.) ¶ 21; Pl. 56.1 ¶ 9.  Plaintiff replied that she wanted to be a woman and that she was.  Ex. A (Dawson Decl.) ¶ 21; Pl. 56.1 ¶ 9.  Holloway responded, "Well, if you are looking for attention, you are getting it."  Ex. A (Dawson Decl.) ¶ 21.

Holloway characterized the blouse as "loose-fitting" and "thin" at his deposition and in his affidavit in support of summary judgment in this case and now says that those qualities could have posed safety concerns, but he did not express any safety concerns during his conversation with Plaintiff about the blouse.  Pl. 56.1 ¶ 9.  Nor does he have any basis to characterize the blouse as loose-fitting or thin.  Holloway did not see the blouse himself, and the information that was reported to him by Remington employee Paul Burns was only that Plaintiff had worn a low-cut blouse.  *Id.*  Burns did not tell Holloway that the blouse was loose-fitting, thin, what material it was made out of, whether it had short or long sleeves, or any other description that could have suggested a safety concern.  *Id.*  The only concern that Holloway did express at the time was that Plaintiff had worn a blouse, which in his mind means something "that a woman wears."  *Id.*

On September 17, 2012, Plaintiff was training Stefan Wood, another employee of Defendant, to build control panels.  Ex. A (Dawson Decl.) ¶ 22.  Wood asked Plaintiff if she was allowed to sign in to work at Remington using her new legal name yet.  Ex. A (Dawson Decl.) ¶ 22; Pl. 56.1 ¶ 13.  Plaintiff responded no and that she still had to sign in as Steven at the guard shack for the security group and on the contractor logs.  Ex. A (Dawson Decl.) ¶ 22; Pl. 56.1

¶ 13.  Wood then asked whether that would be considered a falsification of documentation or an issue of liability and Plaintiff responded that she would think so.  Ex. A (Dawson Decl.) ¶ 22; Pl. 56.1 ¶ 13.

That afternoon, Holloway came to Plaintiff's work area and said, "I'm sorry, Steve.  You do excellent work, but you're too much of a distraction.  I'm going to have to let you go.  I cannot afford to risk this contract over one person."  Ex. A (Dawson Decl.) ¶ 23; Ex. B (Dawson Tr.) 136:8-11.  Plaintiff's employment was terminated effective that day.  Ex. A (Dawson Decl.) ¶ 23.  Holloway also asked Plaintiff about the conversation between her and Wood, and Plaintiff told him what was said.  Ex. A (Dawson Decl.) ¶ 23; Pl. 56.1 ¶ 16.

Holloway informed Ivan Holloway, his father and Defendant's President and owner, that he had fired Plaintiff.  Ex. D (Ivan Holloway Tr.) 12:4-10.  Ivan Holloway testified that, during the conversation in which his son told him that he fired Plaintiff, his son also said that Plaintiff had had a gender change and was wearing earrings and a dress.  Id. at 12:4-10, 16:5-18:6.  Ivan Holloway agreed with Holloway's decision to fire Plaintiff and commented that Plaintiff "shouldn't be wearing earrings on the plant floor and she shouldn't have been wearing a dress on the plant floor."  Id. at 16:9-25.

Plaintiff filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), alleging that her employment was terminated because of her sex and gender transition.  Ex. E (EEOC Charge).  Defendant's Office Manager, Michele Overton, who is also Defendant's human resources manager, received Defendant's copy of Plaintiff's EEOC charge and began to collect documents in order "to respond to the EEOC and tell our side of the story."  Ex. F (Overton Tr.) 32:21-23, 37:13-38:5, 42:1-6; Ex. G (Overton 4/24/13 E-mail).  The only information that Holloway had told Overton about Plaintiff was that she had asked a

Remington manager about earrings and "that she had dressed in a blouse and jewelry when she shouldn't have." Ex. F (Overton Tr.) 37:13-19, 40:2-3; 45:3-8. Overton described the blouse as "frilly and flowy" at her deposition and, like Holloway, characterized the blouse as a safety issue. *Id.* at 38:6-39:1. Overton acknowledged, however, that she had not seen the blouse and that when Holloway told her that Plaintiff wore a blouse, he did not say that the blouse was frilly or flowy or that it was a safety issue. *Id.* at 56:1-23. Overton "thought that the way [Plaintiff] had dressed was – could be the cause of her termination." *Id.* at 37:9-12, 45:1-11. Overton sent an e-mail to Holloway asking if he had "had a chance to talk to Remington about the documentation regarding Patricia's actions and or her clothing/jewelry." Ex. G (Overton 4/24/13 E-mail). By "actions," Overton was referring to the fact that Plaintiff wore a blouse and jewelry. Ex. F (Overton Tr.) 37:8-23. Overton also sent an e-mail to a Remington employee asking him to provide "the name and phone # of the human resources personnel that handled the earring incident with Steve Dawson (Patricia Dawson)." Ex. H (Overton 5/21/13 E-mail). The Remington employee responded that "Remington does not terminate individual Contractor employees" and that Holloway "felt a need to terminate Steve (aka Patricia) and acted on that need." Ex. I (Bennett 5/21/13 E-mail).

Overton initially believed that "the way [Plaintiff] had dressed" was the cause of her termination, Ex. F (Overton Tr.) 37:9-12, 45:1-11, but after speaking with Defendant's attorneys her understanding of why Plaintiff was fired changed, *id.* at 32:2-20, 33:9-20. Overton testified that her knowledge was based solely on conversations with Defendant's attorneys and not any of Defendant's employees, and she declined to answer questions at her deposition about why Plaintiff had been fired. *Id.* at 33:2-20, 57:4-14.

The defense that Defendant presented to the EEOC via counsel was that on September 17, 2012, Holloway was summoned to a meeting by two Remington supervisors, Danny Hopkins and Virgil Bennett to discuss the fact that Plaintiff "had been critical of Remington." Ex. J (Def. 6/26/13 Letter to EEOC). According to Defendant's June 23, 2013, position statement, Hopkins informed Holloway that he had been informed by another Remington employee that Plaintiff had threatened to sue Remington because her safety paperwork had been completed under her former name, Steven Dawson. *Id.* Defendant asserted that Hopkins and Bennett also advised Holloway that Remington was "disturbed" by Plaintiff's statements. *Id.*

Holloway gave a similar story at his April 13, 2015, deposition. He testified that Hopkins and Bennett called a meeting with him on September 17, 2012, about Plaintiff. Ex. C (Holloway Tr.) 66:21-67:14. He said that Hopkins told him he wanted to meet because a Remington employee had overheard Plaintiff say that she could sue Remington because she had not received safety training under her new name. *Id.* According to Holloway, Hopkins asked that Plaintiff be removed from the Remington job site because of her statement. Holloway testified that, at the September 17, 2012, meeting, Hopkins said: "We don't appreciate one of your employees making a comment about Remington and where we work. We feel like you need to remove her from our job site due to, you know, the threat that she had made." *Id.* at 69:18-21, 72:10-23, 73:8-14.

Both Hopkins and Bennett testified at their depositions that the September 17, 2012, meeting described by Holloway never took place. Hopkins testified that he never talked to Holloway about Plaintiff's conversation with Wood or any statement she made, Pl. 56.1 ¶ 15, that he never asked that she be removed from the Remington job site, and that no Remington employee ever asked that she be removed from the job site as far as he knew, Ex. K (Hopkins

Tr.) 33:18-41:19.  Hopkins heard "a story" that Plaintiff had threatened to sue Remington, but he did not know if it was true.  Pl. 56.1 ¶ 15.  He testified that no one at Remington was upset about the statement and, as far as Hopkins knew, nothing happened as a result.  Ex. K (Hopkins Tr.) 33:18-41:19.  Hopkins believed that Plaintiff continued to come to work at the Remington job site after she made the statement and was not aware that she had been let go.  *Id.* at 34:25-35:2. He later considered her resume for an open electrician position at Remington.  *Id.* at 19:8-20:15. Bennett testified that he never heard that Plaintiff said anything related to suing Remington or liability, Pl. 56.1 ¶ 15, and that no Remington employee ever asked that Plaintiff be removed from the job site to his knowledge, Ex. L (Bennett Tr.) 19:13-20:6.  When Holloway told Bennett that he was taking Plaintiff out of the plant, Bennett assumed he did so because the project was over; he was not aware that Plaintiff had been fired.  *Id.* at 18:25-19:12.

Following the depositions of Hopkins and Bennett, Holloway signed an affidavit dated June 5, 2015, in which he stated only that the September 17, 2012, meeting was with "Remington management personnel" and did not identify Hopkins, Bennett, or anyone else as the managers involved.  ECF No. 16-1 (Holloway Aff.) ¶ 11.

At the time she was fired, Plaintiff remained qualified for the position of electrical apprentice, Ex. M (Def. Response to RFA No. 1), and the quality of her electrical work was good, Ex. C (Holloway Tr.) 16:18-20, 22:22-24.  Defendant's decision to terminate Plaintiff's employment was not related in any way to her qualifications or job performance.  *Id.* at at 22:25-23:8.  An employee's sex or gender is not relevant to his or her ability to perform the job of electrical apprentice.  *Id.* at 9:15-20.

## LEGAL STANDARD

Summary judgment may be granted only where the facts, viewed in the light most favorable to the non-moving party, show that there are no genuine issues of material fact in dispute and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A court must accept the evidence of the non-moving party as true and must draw all reasonable inferences in its favor. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986).

Summary judgment is not appropriate where the non-moving party has come forward with specific facts that, when viewed in the context of the record as a whole, could lead a rational fact-finder to find for that party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). Particularly in cases "where motive and intent play leading roles," summary judgment generally is inappropriate. *White Motor Co. v. United States*, 372 U.S. 253, 259 (1963); *United States v. One 1989 Jeep Wagoneer*, 976 F.2d 1172, 1176 (8th Cir. 1992) ("Where mental state or intent . . . is at issue, summary judgment must be granted with caution, as usually such issues raise questions for determination by a factfinder.").

## ARGUMENT

I.  **Title VII's prohibition against sex discrimination protects all employees, including transgender individuals.**

Title VII makes it an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). As a remedial statute, Title VII does not prohibit only discrimination by men against women. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1988). Rather, the statute protects "*all* individuals" from differential treatment

because of their sex.  *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 681 (1983).

Defendant terminated Plaintiff when it became apparent that she was transitioning from male to female.  This is discrimination "because of sex" in the most literal sense.  *See Schroer v. Billington*, 577 F. Supp. 2d 293, 308 (D.D.C. 2008) ("[Defendant]'s refusal to hire [Plaintiff] after being advised that she planned to change her anatomical sex by undergoing sex reassignment surgery was *literally* discrimination 'because of . . . sex.'"); *Macy v. Holder*, EEOC Doc. 0120120821, 2012 WL 1435995, at *10 (EEOC Apr. 20, 2012) ("[I]f Complainant can prove that the reason that she did not get the job . . . is that the Director was willing to hire her when he thought she was a man, but was not willing to hire her once he found out that she was now a woman – she will have proven that the Director discriminated on the basis of sex."); *see also Price Waterhouse v. Hopkins*, 490 U.S. 228, 275 (1989) (O'Connor, J., concurring) ("[T]he explicit consideration of . . . sex . . . in making employment decisions was the most obvious evil Congress had in mind when it enacted Title VII." (internal quotation marks omitted)).

> Imagine that an employee is fired because she converts from Christianity to Judaism.  Imagine too that her employer testified that he harbors no bias toward either Christians or Jews but only "converts."  That would be a clear case of discrimination "because of religion."  No court would take seriously the notion that "converts" are not covered by the statute.  Discrimination "because of religion" easily encompasses discrimination because of a *change* of religion.

*Schroer*, 577 F. Supp. 2d at 306.  So, too, discrimination "because of sex" encompasses discrimination because of an employee's gender transition.  *Id.* at 308.

The prohibition against discrimination "because of sex" is not limited to discrimination based on an individual's male or female chromosomes or anatomy, but it also prohibits

employment decisions based on other aspects of a person's sex,[1] such as gender expression and an individual's conformity (or lack of conformity) with social gender roles. *See Price Waterhouse*, 490 U.S. 228 (termination of female employee because she was considered too masculine violates Title VII); *Macy*, 2012 WL 1435995, at *6 (Title VII prohibits discrimination based "not only on a person's biological sex but also the cultural and social aspects associated with masculinity and femininity"). In *Price Waterhouse*, the Supreme Court recognized that employers discriminate "because of sex" when they make employment decisions based on sex-specific stereotypical beliefs, such as the notion that "a woman cannot be aggressive, or that she must not be." 490 U.S. at 250. The plaintiff in that case, a female senior case manager in an accounting firm, was denied partnership in part because she was considered to be "too macho" for a woman. *Id.* at 235. Her employer advised her that she could improve her chances for partnership if she were "to take 'a course at charm school,'" "'walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry.'" *Id.* In ruling for the plaintiff, the Court made clear that punishment for perceived failure to conform to sex stereotypes, including stereotypical notions about dress and appearance, is a form of sex discrimination actionable under Title VII. *Id.* at 251.

Defendant relies on *Sommers v. Budget Marketing, Inc.*, 667 F.2d 748 (8th Cir. 1982), for the proposition that Title VII does not protect transgender individuals from sex discrimination.[2] In early Title VII cases, some courts, like the Eighth Circuit in *Sommers*, erroneously drew a

---

[1] From a scientific perspective, an individual's gender identity – the innate sense of being male or female – is one of the components that determine an individual's sex or gender. *In re Lovo-Lara*, 23 I. & N. Dec. 746, 752 (BIA 2005) (discussing eight components that determine an individual's sex). For this reason, discrimination based on gender identity also is impermissible discrimination "because of sex."

[2] Defendant also argues that sexual orientation is not a characteristic protected by Title VII, but this case does not involve sexual orientation discrimination.

rigid distinction between anatomical "sex" and behavioral "gender" and excluded discrimination against transgender people from the statute's scope.  *See id.* at 750 ("[D]iscrimination based on one's transsexualism does not fall within the protective purview of [Title VII]."); *Ulane v. E. Airlines, Inc.*, 742 F.2d 1081, 1084-85 (7th Cir. 1984) (same); *Holloway v. Arthur Andersen & Co.*, 566 F.2d 659, 662 (9th Cir. 1977) (rejecting argument that the term "sex" includes a person's "gender"), *overruled by Schwenk v. Hartford*, 204 F.3d 1187 (9th Cir. 2000).

However, those cases are no longer good law in light of the Supreme Court's subsequent decision in *Price Waterhouse*.  "[F]ederal courts have recognized with near-total uniformity that "'the approach in *Holloway*, *Ulane*, and *Sommers*'" was "'eviscerated'" by the decision in *Price Waterhouse*.  *Glenn v. Brumby*, 663 F.3d 1312, 1318 n.5 (11th Cir. 2011) (quoting *Smith v. City of Salem, Ohio*, 378 F.3d 566, 573 (6th Cir. 2004)); *see also Radtke v. Misc. Drivers & Helpers Union Local #638*, 867 F. Supp. 2d 1023, 1032 (D. Minn. 2012) (same).[3]

Every federal appellate court that has considered sex discrimination claims brought by transgender people post-*Price Waterhouse* has reaffirmed that laws prohibiting sex

---

[3] *Sommers* also mistakenly read an implicit "transsexual exception" into Title VII on the grounds that "the legislative history does not show any intention to include transsexualism in Title VII." 667 F.2d at 750.  In *Oncale*, decided after *Sommers*, however, the Supreme Court squarely rejected the notion that legislative intent could limit the forms of sex discrimination prohibited by Title VII:

> We see no justification in the statutory language or our precedents for a categorical rule excluding same-sex sexual harassment claims from the coverage of Title VII.  As some courts have observed, male-on-male sexual harassment in the workplace was assuredly not the principal evil Congress was concerned with when it enacted Title VII.  But statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed.

523 U.S. at 79; *Glenn*, 663 F.3d at 1318 n.5 (*Sommers*' "reliance on the presumed intent of Title VII's drafters is also inconsistent with *Oncale*" as well as *Price Waterhouse*).  Just as there is no exception to Title VII for same-sex sexual harassment, *see Oncale*, 523 U.S. at 79, there is no exception for transgender people either.

discrimination do not exclude transgender individuals from their protections. *Smith*, 378 F.3d at

570 (allowing Title VII claim by transgender employee to proceed); *Rosa v. Park West Bank &*

*Trust Co.*, 214 F.3d 213 (1st Cir. 2000) (allowing sex discrimination claim by transgender loan

applicant to proceed under Equal Credit Opportunity Act); *Schwenk*, 204 F.3d at 1199-1203

(allowing sex discrimination claim by transgender prisoner to proceed under Gender Motivated

Violence Act); *see also Glenn*, 663 F.3d at 1314 (allowing equal protection sex discrimination

claim by transgender public employee to proceed); *Etsitty v. Utah Trans. Auth.*, 502 F.3d 1215,

1224 (10th Cir. 2007) (assuming that transgender employees may bring sex stereotyping claims

under Title VII). Numerous other courts have allowed Title VII claims brought by transgender

plaintiffs to proceed after *Price Waterhouse*.[4] As Defendant concedes, Def. Br. at 5, "[a]ll

persons, whether transgender or not, are protected from discrimination on the basis of gender

stereotype." *Glenn*, 663 F.3d at 1318. As many courts have recognized, because transgender

people fail to conform to sex stereotypes by definition, discrimination against an individual

because he or she is transgender is a form of impermissible sex stereotyping. *Id.* at 1316; *id.* at

1317 ("A person is defined as transgender precisely because of the perception that his or her

behavior transgresses gender stereotypes."); *Smith*, 378 F.3d at 574 ("[D]iscrimination against a

plaintiff who is transsexual – and therefore fails to act and/or identify with his or her gender – is

no different from the discrimination directed against Ann Hopkins in *Price Waterhouse*, who, in

sex-stereotypical terms, did not act like a woman."); *Schroer*, 577 F. Supp. 2d at 305 (Title VII

prohibits discrimination whether employer perceived the plaintiff, a transgender woman, "to be

---

[4] *See, e.g.*, *Hughes v. William Beaumont Hosp.*, No. 13-cv-13806, 2014 WL 5511507 (E.D.
Mich. Oct. 31, 2014); *Finkle v. Howard Cnty., Md.*, 12 F. Supp. 3d 780 (D. Md. 2014); *Schroer*,
577 F. Supp. 2d 293; *Lopez v. River Oaks Imaging & Diagnostic Grp., Inc.*, 542 F. Supp. 2d. 653
(S.D. Tex. 2008); *Tronetti v. TLC HealthNet Lakeshore Hosp.*, No. 03-CV-0375E(SC), 2003 WL
22757935 (W.D.N.Y. Sept. 26, 2003).

an insufficiently masculine man, an insufficiently feminine woman, or an inherently gender-nonconforming transsexual"); *see also Finkle*, 12 F. Supp. 3d at 788 (denying motion to dismiss Title VII claim where plaintiff alleged that she was denied employment "because of her obvious transgendered status").[5]

The EEOC and U.S. Department of Justice, federal agencies charged with the enforcement of Title VII, agree that discrimination against an individual because he or she is transgender is inherently sex discrimination because it involves an impermissible gender-based consideration. *See Macy*, 2012 WL 1435995, at *7 ("When an employer discriminates against someone because the person is transgender, the employer has engaged in disparate treatment 'related to the sex of the victim.'"); *id.* at *8 ("[C]onsideration of gender stereotypes will inherently be part of what drives discrimination against a transgendered individual."); Memo. from Att'y Gen. to U.S. Att'ys & Heads of Dep't Components re: Treatment of Transgender Employment Discrimination Claims Under Title VII of the Civil Rights Act of 1964 (Dec. 15, 2014) at 2, *available at* http://www.justice.gov/file/188671/download ("[T]he best reading of Title VII's prohibition of sex discrimination is that it encompasses discrimination based on gender identity, including transgender status.").[6]

---

[5] The sole post-*Price Waterhouse* transgender discrimination case on which Defendant relies, *Etsitty*, 502 F.3d 1215, is inconsistent with both the logic and the result in *Price Waterhouse* and *Oncale*. Moreover, even the *Etsitty* decision assumed that transgender employees may bring sex discrimination claims under Title VII when they can present specific evidence of sex stereotyping. *See id.* at 1224. As discussed in Point II *infra*, there is ample evidence in the record that Defendant terminated Plaintiff's employment because she failed to conform to sex stereotypes.

[6] *See also EEOC v. Deluxe Fin. Servs. Inc.*, No. 0:15-cv-02646 (D. Minn. June 8, 2015) (Title VII action on behalf of transgender employee); Br. of U.S. EEOC as Amicus Curiae in Support of Plaintiff-Appellant Loretta Eure and Reversal, *Eure v. Sage Corp.*, No. 14-51311 (5th Cir. filed Apr. 22, 2015) (arguing that discrimination against transgender people is cognizable discrimination because of sex); *EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, No. 14-

## II.     Strong evidence that Defendant's decision to fire Plaintiff was because of her sex precludes summary judgment.

An employee survives an employer's motion for summary judgment when she creates the requisite inference of unlawful discrimination under the *McDonnell Douglas* framework. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). "Discrimination occurs when sex 'was a motivating factor'" for an adverse employment decision, even if "'other factors also motivated'" the decision. *Lewis*, 591 F.3d at 1038 (quoting 42 U.S.C. § 2000e-2(m)); *Roberts v. Park Nicollet Health Servs.*, 528 F.3d 1123, 1127 (8th Cir. 2008). If the employee makes out a prima facie case, that creates a presumption of unlawful discrimination that, in turn, requires the employer to come forward with a legitimate, nondiscriminatory reason for the adverse action. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). If the employer meets its burden of production, the plaintiff can still prevail by providing evidence that the employer's proffered explanation is pretext for unlawful discrimination. *Hilde v. City of Eveleth*, 777 F.3d 998, 1004 (8th Cir. 2015). A plaintiff in an employment discrimination case can demonstrate a material question of fact as to pretext by showing either that "the employer's proffered explanation is unworthy of credence," or "by persuading the court that a discriminatory reason more likely motivated the employer." *Burdine*, 450 U.S. at 256.

---

13710, 2015 WL 1808308 (E.D. Mich. Apr. 21, 2015) (Title VII action on behalf of transgender woman who was fired because she is transgender and informed her employer of her intent to transition from male to female); *United States v. Se. Okla. State Univ.*, No 5:15-cv-00324-C (W.D. Okla. filed Mar. 30, 2015) (Title VII action on behalf of transgender woman who was denied tenure because she is transgender and transitioned from male to female); Statement of Interest of United States, *Jamal v. SAKS & Co.*, No. 4:14-cv-02782 (S.D. Tex. filed Jan. 26, 2015) (refuting employer's contention that transgender individuals cannot bring sex discrimination claims under Title VII); *EEOC v. Lakeland Eye Clinic, P.A.*, No. 8:14-cv-2421 (M.D. Fla. filed Sept. 24, 2015) (Title VII action on behalf of transgender woman who was fired because she is transgender and transitioned from male to female).

The record evidence in this case shows that Plaintiff is a member of a class of people protected by Title VII, that she was well qualified for the position of electrical apprentice, that she was fired, and that the circumstances surrounding the termination of her employment create an inference of discrimination because of sex – specifically, that she was terminated because of her gender transition.  Defendant's proffered explanation for its decision – that it fired Plaintiff because she threatened to sue a client company – is unworthy of credence because it is flatly contradicted by the testimony of neutral third-party witnesses.  Even if Defendant's story were not factually refuted, however, Plaintiff has presented ample evidence that she was fired at least in part because of her gender transition.  Therefore, Defendant is not entitled to judgment as a matter of law.

A.      **The record is replete with evidence that Defendant's decision to fire Plaintiff was because of sex.**

Under the *McDonnell Douglas* framework, Plaintiff can make out a prima facie case of discrimination under Title VII by showing that "(1) she was a member of the protected group; (2) she was qualified to perform the job; (3) she suffered an adverse employment action; and (4) circumstances permit an inference of discrimination."  *Lewis*, 591 F.3d at 1037.  Each of those elements is satisfied on the record here.

*First*, Plaintiff is protected by Title VII's prohibition against discrimination because of sex.  As explained in Point I *supra*, the fact that Plaintiff is transgender does not place her outside of the coverage of Title VII.  *Second*, it is undisputed that Plaintiff was qualified for the position of electrical apprentice and that her sex or gender is irrelevant to her qualifications.  Def. Br. at 7; Ex. M (Def. Response to RFA No. 1); Ex. C (Holloway Tr.) 9:15-20, 16:18-20, 22:22-24.  *Third*, Defendant also does not dispute that Plaintiff suffered an adverse employment action when Defendant terminated her employment.  Def. Br. at 7.

*Fourth*, the record in this case is replete with evidence from which a reasonable fact-finder could conclude that Marcus Holloway's decision to fire Plaintiff was because of her sex. Holloway's first response to the news that Plaintiff is transgender was to say "I'd hate to lose you," implying he might have to fire her even though she was one of his "best people." Ex. A (Dawson Decl.) ¶ 11; Pl. 56.1 ¶ 11. Although after taking the weekend think about what to do, Ex. A (Dawson Decl.) ¶ 11; Pl. 56.1 ¶ 11, Holloway did not fire Plaintiff, he instead required her to hide the fact that she is transgender in order to continue to work on the Remington job site. He instructed her not to discuss her transition with anyone at work, not to use her legal name, not to wear women's clothing, and not to use the women's restroom. Ex. A (Dawson Decl.) ¶ 12; Ex. B (Dawson Tr.) 121:18-122:6, 157:20-158:13. Holloway insisted that Plaintiff dress as and appear to be a man despite Plaintiff's repeated requests that she be allowed to use her legal name, Patricia, and be the woman that she was. Ex. A (Dawson Decl.) ¶ 21; Pl. 56.1 ¶ 9.

After Plaintiff began to wear feminine clothing, a bra, and makeup at work and people began to notice, Holloway made the decision to fire her within a matter of days. Holloway was disturbed by the fact that Plaintiff wore a blouse – something "that a woman wears" – to work. Pl. 56.1 ¶ 9. He also was upset that others on the Remington job site were talking to him about Plaintiff's feminine attire. Holloway told Plaintiff that it had been noticed and reported to him by a Remington employee that Plaintiff wore a blouse to work, and he asked her if she did in fact wear a blouse. *Id.*; Ex. A (Dawson Decl.) ¶ 21. Plaintiff responded that she did. Ex. A (Dawson Decl.) ¶ 21; Pl. 56.1 ¶ 9. Holloway then asked if the blouse was low cut, and Plaintiff told him that it was a little low cut but not inappropriate. Ex. A (Dawson Decl.) ¶ 21; Pl. 56.1 ¶ 9. Holloway accepted Plaintiff's characterization of the blouse as not too low cut, Pl. 56.1 ¶ 9, but he remained bothered that she wore women's attire to work. He asked her, "Are you trying to

drive me into early retirement?" and complained that he could not get any work done because people were constantly coming up to him and talking to him about Plaintiff.  Ex. A (Dawson Decl.) ¶ 21; Pl. 56.1 ¶ 9.  Holloway also asked Plaintiff, "What do you want out of this?" and commented to her, "Well, if you are looking for attention, you are getting it."  Ex. A (Dawson Decl.) ¶ 21; Pl. 56.1 ¶ 9.  Those remarks suggest that Holloway thought there was something improper about Plaintiff's request to dress and appear as a woman.

Defendant's post-hoc attempt to justify Holloway's reaction to the blouse as a safety concern is not supported by the record.  Although Holloway now characterizes the blouse as unsafe for work because it was "loose-fitting" and "thin," he has no basis to characterize the blouse this way.  Holloway never saw the blouse himself, and he was told only that Plaintiff wore a "low cut blouse."  Pl. 56.1 ¶ 9.  He was not told that the blouse was loose-fitting, thin, what material it was made out of, whether it had short or long sleeves, or any other description that could have suggested a safety concern.  *Id.*  Although Holloway initially thought the blouse may have been low cut, he believed Plaintiff that the blouse was not inappropriately low cut.  *Id.* The only concern that Holloway expressed to Plaintiff or to Defendant's human resources manager at the time – and the only information that Holloway had then (or now) – was that Plaintiff wore a blouse, which he believed to be something "that a woman wears."  *Id.*; Ex. F (Overton Tr.) 56:1-23.  That suggests the true source of Holloway's objection was that he "saw a man in women's clothing."  *Cf. Schroer*, 577 F. Supp. 2d at 305-06.  That Holloway fired Plaintiff roughly a week after he learned that she wore a blouse to work is further evidence that his decision was motivated by her sex.  "[C]lose temporal proximity" between when a protected characteristic becomes apparent and the adverse employment action can support an inference of discrimination.  *Strate v. Midwest Bankcentre, Inc.*, 398 F.3d 1011, 1020 (8th Cir. 2005)

(temporal proximity of two months between when employer learned that plaintiff had a disabled child and employer's decision to eliminate plaintiff's job contributed to triable issue of fact as to employer's motivation).

Holloway's own statements to Plaintiff when he fired her provide additional evidence that gives rise to an inference of discrimination. Holloway told Plaintiff that she was "too much of a distraction" and that he could "not afford to risk this contract over one person." Ex. A (Dawson Decl.) ¶ 23. Taken in context less than a week after the conversation about Plaintiff's blouse, Holloway's statements reflect his discomfort with the fact that people on the Remington job site noticed that Plaintiff was wearing a women's blouse and were talking and even complaining to him about it. It makes no difference whether Holloway himself found it unacceptable for Plaintiff to wear women's clothing or whether he believed that Defendant's customer, Remington, found Plaintiff's sex and gender transition unacceptable. Customer preference is not a defense to discrimination because of sex, and Defendant cannot hide behind Holloway's fear that Remington might cancel its contract because of Plaintiff's gender identity. *See Bradley v. Pizzaco of Neb., Inc.*, 7 F.3d 795, 799 (8th Cir. 1993) (collecting cases).

The testimony of Defendant's President and its Office Manager provide additional evidence from which a trier of fact could conclude that Holloway's decision to terminate Plaintiff's employment was because of her sex. When Holloway called his father, Defendant's President and owner, to tell him that he had fired Plaintiff, Holloway also told him that Plaintiff had had a gender change and was wearing earrings and, as Ivan Holloway remembers it, a dress. Ex. D (Ivan Holloway Tr.) 12:4-10, 16:5-18:6. That Holloway raised the issue of Plaintiff's gender transition and feminine attire and jewelry in the same conversation in which he discussed the termination of Plaintiff's employment is telling. What is more, Ivan Holloway testified that

21

he agreed with Holloway's decision to fire Plaintiff and that she "shouldn't be wearing earrings on the plant floor and she shouldn't have been wearing a dress on the plant floor." *Id.* at 16:9-25.

Events after Plaintiff filed her Charge of Discrimination are especially illuminating. Michele Overton, Defendant's human resources manager, testified that when she received Plaintiff's EEOC charge, she "thought that the way she had dressed was – could be the cause of her termination." Ex. F (Overton Tr.) 37:9-12, 45:1-11. She thought that because the only information that Holloway had told Overton about Plaintiff was "that she had dressed in a blouse and jewelry when she shouldn't have." *Id.* at 37:13-19, 40:2-3; 45:3-8. Believing that Plaintiff's employment had been terminated because of her clothing and jewelry, Overton made efforts to collect documents to corroborate the decision to fire her on that basis. *Id.* at 32:21-23, 42:1-6. Overton sent an e-mail to Holloway asking he if had "had a chance to talk to Remington about the documentation regarding Patricia's actions and or her clothing/jewelry." Ex. G (Overton 4/24/13 E-mail). She also sent an e-mail to Remington asking for "the name and phone # of the human resources personnel that handled the earring incident with Steve Dawson (Patricia Dawson)." Ex. H (Overton 5/21/13 E-mail). Although Overton admitted that she initially believed that Plaintiff was fired because of "the way she had dressed," Ex. F (Overton Tr.) 37:9-12, 45:1-11, she also stated that she was later told by Defendant's counsel that that was not the reason, *id.* at 32:2-20, 33:9-20. When asked what the true cause was, however, Overton testified that her knowledge of why Plaintiff was fired came solely from Defendant's attorneys and not any of Defendant's employees, and she refused to answer. *Id.* at 33:2-20, 57:4-14. That Overton initially believed that Plaintiff was fired because she wore women's clothing and jewelry, and that her understanding of why Plaintiff was fired changed based solely on conversations with

Defendant's attorneys after the fact, strongly suggest that Defendant's actual motivation was unlawful.

Contrary to Defendant's misunderstanding of the law, there is no requirement that Plaintiff prove as part of her prima facie case (or at any other stage) that other employees were treated differently. *See Lewis*, 591 F.3d at 1040 (citing *Oncale*, 523 U.S. at 77). The issue is "*the individual plaintiff*'s treatment, not the relative treatment of different *groups* within the workplace." *Id.* at 1039 (internal quotation marks omitted); *Connecticut v. Teal*, 457 U.S. 440, 453-54 (1982). Consequently, Plaintiff "need only offer evidence that *she* was discriminated against because of her sex." *Lewis*, 591 F.3d at 1040. Taken together, the record evidence is more than sufficient to raise a genuine issue of material fact as to whether Defendant fired Plaintiff because of her sex.

**B.** **Triable issues of fact exist as to whether Defendant's proffered justification is pretextual.**

Defendant offers just one explanation for its decision to fire Plaintiff – that she supposedly threatened to sue Remington. Even assuming that Defendant's proffered justification were legitimate, the record contains more than enough evidence from which a fact-finder could conclude that that reason is pretext for discrimination against Plaintiff because of her sex. An employee may demonstrate that the proffered reason is pretextual by showing either that "the employer's proffered explanation is unworthy of credence" or by "persuading the court that a prohibited reason more likely motivated the employer." *Hudson v. Tyson Fresh Meats, Inc.*, No. 14-1852, --- F.3d ---, 2015 WL 2434933, at *3 (8th Cir. May 22, 2015); *see also Reeves*, 530 U.S. at 143. Where a plaintiff shows that there is a genuine issue of material fact as to whether the defendant's proffered justification is false, she can prevail at the summary judgment stage. *Reeves*, 530 U.S. at 148; *see, e.g.*, *Hudson*, 2015 WL 2434933, at *4. That is because her prima

facie case of discrimination, "combined with sufficient evidence to find that the employer's

asserted justification is false, may permit the trier of fact to conclude that the employer

unlawfully discriminated." *Reeves*, 530 U.S. at 148.  Here, Plaintiff can demonstrate both that

Defendant's proffered justification is unworthy of credence and that Defendant was more likely

motivated by an unlawful purpose.

> **1.  Defendant's stated reason for terminating Plaintiff's employment is unworthy of credence because it is contradicted by third-party witnesses.**

The record here creates a genuine issue of material fact as to whether Defendant's

explanation is false.  *See Hudson*, 2015 WL 2434933, at *4.  The defense that Defendant

presented to the EEOC in June 2013, less than a year after Plaintiff was fired, was that

Remington supervisors Danny Hopkins and Virgil Bennett called a meeting with Holloway on

September 17, 2012, to discuss the fact that Plaintiff "had been critical of Remington."  Ex. J

(Def. 6/26/13 Letter to EEOC).  Defendant took the position that, at the September 17, 2012,

meeting, Hopkins not only informed Holloway that it had been reported to him that Plaintiff

threatened to sue Remington, but also told him that Remington was "disturbed" by Plaintiff's

statements.  *Id.*  Holloway reaffirmed and elaborated on this story at his April 2015 deposition.

At his deposition, Holloway again identified Hopkins and Bennett as the Remington supervisors

who called the September 17, 2012, meeting.  He also testified that Hopkins told him "you need

to remove her from [the Remington] job site" because of her statement.  Ex. C (Holloway Tr.)

69:18-21, 72:10-23, 73:8-14.

Holloway's story was flatly contradicted by Hopkins and Bennett, two neutral third-party

witnesses.  Hopkins denied asking that Plaintiff be removed from the job site, denied saying that

Remington was disturbed by Plaintiff's statement, and denied saying anything at all to Holloway

about Plaintiff's statement.  Pl. 56.1 ¶ 15; Ex. K (Hopkins Tr.) 33:18-41:19.  In fact, Hopkins denied that the September 17, 2012, meeting ever even happened.  Pl. 56.1 ¶ 15.  Although Hopkins was aware that others on the job site were telling "a story" that Plaintiff had threatened to sue Remington, he did not know if it was true, and he did not take any action in response.  *Id.*; Ex. K (Hopkins Tr.) 33:18-41:19.  Nor did he think that Plaintiff's statement, even if made, warranted her removal from the job site.  According to Hopkins, while workers at Remington were talking about Plaintiff's statement, no one was upset about it and no one asked that she be removed from the job site.  Pl. 56.1 ¶ 15; Ex. K (Hopkins Tr.) 33:18-41:19.  Hopkins had no idea that Plaintiff had been fired as a result of the statement or for any other reason.  Ex. K (Hopkins Tr.) 34:25-35:2.  He even later considered Plaintiff's resume for an open electrician position at Remington.  *Id.* at 19:8-20:15.  Hopkins's testimony and conduct is wholly inconsistent with Holloway's story that Hopkins was "disturbed" by Plaintiff's conduct and that Hopkins felt she needed to be removed from Remington's premises.

Bennett, the second Remington manager identified by Hopkins, knew even less about Plaintiff's supposed threat than Hopkins did.  Bennett also denied that the September 17, 2012, meeting between himself, Hopkins, and Holloway happened.  Pl. 56.1 ¶ 15.  He never heard that Plaintiff said anything about liability or threatening to sue Remington or that anyone at Remington asked that she be removed from the job site for any reason.  *Id.*; Ex. L (Bennett Tr.) 19:13-20:6.  Bennett, like Hopkins, did not know even that Plaintiff had been fired.  Ex. L (Bennett Tr.) 18:25-19:12.

Defendant's attempt to revive its defense with Holloway's June 2015 affidavit, prepared in connection with its motion for summary judgment, must fail.  Holloway's affidavit, which was prepared after he had the opportunity to review Hopkins and Bennett's deposition testimony,

minimizes Remington's involvement in his decision to fire Plaintiff.  In his affidavit, Holloway says only that he met with "Remington management personnel" and does not identify Hopkins or Bennett as the managers involved.  ECF No. 16-1 (Holloway Aff.) ¶ 11.  Nor does he identify other Remington managers who were involved.  Instead, Holloway now suggests that his decision to fire Plaintiff was based in whole or in large part on information he received directly from one of his own employees as well as his own conversation with Plaintiff.  Although Holloway claims that Plaintiff "admitted having made the statements" and "that she had used a poor choice of language," *id.* ¶ 12, Plaintiff never said that she threatened to sue Remington or that she may have used inappropriate language, Pl. 56.1 ¶ 17.  That Holloway shifted his explanation on the eve of Defendant's motion for summary judgment, and that he attempted to backtrack from the story he told the EEOC closer in time to the adverse employment action, is further evidence that his story is false.  *See Baker v. Silver Oak Senior Living Mgmt. Co., L.C.*, 581 F.3d 684, 689 (8th Cir. 2009) (employer's "shifting explanations for why [the plaintiff] was terminated" creates "an inference of pretext").  Even without Holloway's shifting explanations, a trier of fact could reject Defendant's proffered justification.  The testimony of Hopkins and Bennett is more than "sufficient evidence to find that the employer's asserted justification is false." *See Reeves*, 530 U.S. at 148.  Where "the only [other] two individuals in the room[] portray the encounter in starkly different terms" than Holloway does, a reasonable factfinder could conclude that Defendant's explanation is false.  *See Lewis*, 591 F.3d at 1041; *Roberts*, 528 F.3d at 1128-29 (noting that a factfinder could find conflicting evidence to be probative of falsity).  And, "once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation." *Reeves*, 530 U.S. at 147.  Plaintiff therefore is entitled to a trial on whether Defendant's decision to fire her was because of sex.

**2.      Even if Defendant's account of its stated reason for terminating Plaintiff's employment had not been factually refuted, a trier of fact could conclude that sex more likely motivated the decision in whole or in part.**

Even if the trier of fact were to credit Defendant's story notwithstanding the evidence of its falsity, Plaintiff can still prevail by showing "that a prohibited reason more likely motivated" the decision to fire her. *See Hudson*, 2015 WL 2434933, at *3. Plaintiff does not need to present new or different evidence of discrimination to meet this standard. Rather, "strong evidence of a prima facie case" of discrimination also "may establish pretext." *Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 867 (8th Cir. 2006); *see also Reeves*, 530 U.S. at 143.

Here, the strength of Plaintiff's prima facie case of discrimination is sufficient to create a triable issue of fact as to pretext. Plaintiff has presented evidence that Holloway's initial reaction to the news that she is transgender was he would have to fire her because of her gender transition ("I'd hate to lose you"); that he repeatedly directed Plaintiff to "keep quiet" about her gender transition and refused to allow her to use her legal name at work, dress in women's clothing, or use the women's restroom; that he questioned her about wearing a women's blouse to work and asked if she was trying to drive him into early retirement by doing so; that he complained that he could not get any work done because people kept coming up to him to talk to him about the fact that Plaintiff wore women's clothing; that he fired her approximately one week after it was reported to him that she wore a blouse at work; and that he fired her despite the fact that she does "excellent work" because she was "too much of a distraction." The evidence shows that Plaintiff's feminine appearance was critical. Defendant's human resources manager testified that the only thing she knew about Plaintiff's termination was "that she had dressed in a blouse and jewelry when she shouldn't have" and that she "thought that the way she had dressed was – could be the cause of her termination." Defendant's post-hoc attempt to frame the objection to

Plaintiff's blouse as a safety issue because it was loose-fitting and thin is refuted by Holloway's admission that he never saw the blouse and had no idea whether it was loose-fitting or thin. Defendant's President and owner, when he learned that Plaintiff had been fired, responded by saying that she "shouldn't be wearing earrings on the plant floor and she shouldn't have been wearing a dress on the plant floor."  This evidence is more than sufficient to present a factual issue as to whether Defendant's explanation was pretext for discrimination because of Plaintiff's sex.

Moreover, Plaintiff can prevail by showing that her sex was a motivating factor in Defendant's decision to fire her, even if other, lawful factors also played into the decision. *Roberts*, 528 F.3d at 1127; *e.g.*, *Radabaugh v. Zip Feed Mills, Inc.*, 997 F.2d 444, 450 (8th Cir. 1993).  The question is not whether there is evidence that discrimination was the only reason for the adverse employment action, but "whether the plaintiff has sufficient evidence that unlawful discrimination was *a* motivating factor in the defendant's adverse employment action.  If so, then the presence of additional legitimate motives will not entitle the defendant to summary judgment."  *Roberts*, 528 F.3d at 1127 (internal quotation marks and citation omitted).  Here, even if a factfinder were to conclude that Holloway's belief that Plaintiff threatened to sue Remington contributed to his decision to fire her, it could find that Plaintiff's sex was also a motivating factor for the decision.  The ample evidence in support of Plaintiff's prima facie case is more than sufficient for a trier of fact to conclude that, at a bare minimum, Plaintiff's sex played a part in Defendant's decision.  That Defendant was motivated in any part by Plaintiff's sex is inconsistent both with the plain text of Title VII, *see* 42 U.S.C. § 2000e-2(m), as well as *Price Waterhouse*'s mandate that "gender must be irrelevant to employment decisions."  490 U.S. at 240.

## <u>CONCLUSION</u>

For all of the foregoing reasons, Defendant's motion for summary judgment should be denied.

Respectfully submitted,


By: <u>*s/ Ria Tabacco Mar*</u>
Ria Tabacco Mar*
Leslie Cooper
American Civil Liberties Union
  Foundation
125 Broad Street
New York, New York 10004
Telephone: (212) 549-2627
E-mail: rmar@aclu.org
        lcooper@aclu.org

* *admitted pro hac vice*

John Burnett (Arkansas Bar No. 77021)
Lavey and Burnett
904 West 2nd Street
Little Rock, Arkansas 72201
Telephone: (501) 376-2269
E-mail: jburnett@laveyandburnett.com
*On behalf of the Arkansas Civil Liberties Union*
        *Foundation, Inc.*


*Attorneys for Plaintiff*

Dated: June 19, 2015

## CERTIFICATE OF SERVICE

I hereby certify that on June 19, 2015, I electronically filed the foregoing Plaintiff's Brief in Support of Response in Opposition to Defendant's Motion for Summary Judgment with the Clerk of Court via the Court's CM/ECF system, which shall send notification of such filing to counsel for Defendant, William P. Dougherty and Sam Strange, by electronic mail addressed as follows:  Bill_2008@comcast.net; sstrange@hosto.com.

By:  *s/ Ria Tabacco Mar*
Ria Tabacco Mar*
Leslie Cooper
American Civil Liberties Union
 Foundation
125 Broad Street
New York, New York 10004
Telephone: (212) 549-2627
E-mail: rmar@aclu.org
        lcooper@aclu.org

* *admitted pro hac vice*

John Burnett (Arkansas Bar No. 77021)
Lavey and Burnett
904 West 2nd Street
Little Rock, Arkansas 72201
Telephone: (501) 376-2269
E-mail: jburnett@laveyandburnett.com
*On behalf of the Arkansas Civil Liberties Union*
        *Foundation, Inc.*

*Attorneys for Plaintiff*